**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **CHRIS SPENCER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No. 3:19-cv-00983** |
| **CITY OF HENDERSONVILLE,** | ) | **Judge Aleta A. Trauger** |
| **SCOTTY BUSH, in his official capacity as** | ) | |
| **Fire Chief, and PAUL VARBLE in his** | ) | |
| **official capacity as Fire Marshall[1] and in** | ) | |
| **his individual capacity,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### MEMORANDUM

Before the court are two Motions to Dismiss. (Doc. Nos. 39, 41.) For the reasons set forth

herein, the court will grant both motions and dismiss this case in its entirety.

## I.   FACTUAL AND PROCEDURAL BACKGROUND[2]

Plaintiff Chris Spencer is a political activist who lives in Hendersonville, Tennessee. The

defendants are the City of Hendersonville ("City"); Scotty Bush, Chief of the Hendersonville Fire

Department ("HFD"), sued in his official capacity only; and Fire Marshal Paul Varble, sued in

both his individual and official capacities.

The City is an "aldermanic municipality," meaning that it is governed by a Board of Mayor

and Aldermen ("BOMA"), consisting of an elected mayor and twelve elected aldermen, two from

---

[1] "Marshall" is an accepted variant of "marshal." The plaintiff uses the spelling "marshall" throughout his filings; the defendants use both versions. The court will use the preferred form "marshal," except in the case caption and direct quotations that employ the variant.

[2] The facts set forth herein are drawn from the Amended Complaint (Doc. No. 36).

each of the City's six wards. Spencer decided to run for election as an alderman in Ward 5, running on a "small government, anti-corruption" platform, and his views in that regard were well known. (Doc. No. 36 ¶ 4.) He registered as a candidate on December 6, 2017 for the election to be held in November 2018 and began campaigning shortly thereafter.

He alleges that, upon learning of his candidacy, some of the City's "entrenched" "career politicians" immediately began strategizing about how to defeat him. Their tactics varied from "making derogatory comments about Spencer during BOMA meetings" to "making such comments on social media." (*Id.* ¶ 9.) In addition, the same contingent went looking for an opponent who could defeat him. "They" eventually settled on Jonathan Hayes, who, Spencer alleges, was "a known ally of the aforementioned government contingent" and advocates for tax increases. (*Id.* ¶ 10.) Hayes did not officially announce his candidacy until August 13, 2018, almost eight months after Spencer and just three months before the election.

According to Spencer, although there are others whose identity he does not know, two City officials and employees who opposed his candidacy were defendants Varble and Bush. While attending a BOMA meeting conducted at City Hall, which he attended in his official capacity while wearing his Fire Marshal uniform, "Varble told a citizen he would do anything to defeat Spencer as Spencer would be against pay raises for the HFD." (*Id.* ¶ 11.) The plaintiff alleges "[u]pon information and belief" that Bush agreed with this sentiment. (*Id.*) At some point, Hayes sent a text to Bush and Varble to thank them "for the campaign efforts by firemen," to which Bush responded: "Glad its working for you" and "You got this." (*Id.*)

Bush and Varble were also advocates for new administrative offices and a new fire station for the HFD. The project was approved in 2017, but, due to the expense of the project and the City's difficulty in finding money to allocate to it, the project had not been built by the fall of 2018.

Bush and Varble continued to advocate for the project, including by petitioning aldermen and by supporting candidates running for the office of alderman who, they believed, would support that project and pay raises for firemen as well. Hayes was one such candidate. Spencer, on the other hand, publicly took the position that he did not believe the City should allocate funds away from other projects, like paving, to pay for new HFD offices.

Spencer identifies Varble as the "primary actor" behind the plan to defeat Spencer "with the use of City resources and employees." (*Id.* ¶ 13.) Varble allegedly met with various individuals who were running for the first time or running for re-election as alderman, including Alderman Arlene Cunningham. Cunningham had been an alderman for many years and was seeking re-election. She "did not support Spencer and his small government agenda." (*Id.*) On August 22, 2018, Varble contacted Cunningham to ask if he could "buy her lunch." (*Id.*) He purportedly used a City telephone during business hours to make this call.

Varble and Cunningham allegedly met for lunch the next day. The plaintiff does not claim that this meeting took place during Varble's business hours or at a City facility. The plaintiff states that Varble "indicated" to Cunningham that fire department employees "were to be employed to campaign" for or against certain candidates who, Varble believed, would support the building of the new fire hall and pay raises for firemen. Varble allegedly also communicated his "disdain for Spencer" and his support for Hayes, who was running against Spencer. (*Id.* ¶ 14.) Cunningham made it clear that she supported Varble's pet projects and asked Varble if "the guys" could support her candidacy as well. Varble agreed, and Cunningham assured him he could count on her support for the HFD. The plaintiff alleges "[u]pon information and belief" that Varble "unlawfully coordinated an unlawful [sic] campaign effort using City firemen in their purported official capacities to support" Cunningham, Hayes, and other candidates (*id.* ¶ 15), in exchange for these

candidates' commitment to support projects beneficial to the HFD.

On August 21, 2018, the International Association of Fire Fighters, Local Chapter 3460 (the "local union" or "local firefighters' union"), endorsed Hayes, and Hayes posted a photograph on his Facebook page of him with two firemen, both wearing shirts that read "Hendersonville Fire." (*Id.* ¶ 17.)

Spencer claims that Varble "coordinated an unlawful campaign effort to benefit Hayes." (*Id.*) In particular, Varble allegedly "directed" this campaign using "his City phone and during business hours" and using his "City desk to maintain his calendar to document who would be campaigning at his direction." (*Id.* ¶ 18.) The plaintiff alleges that Varble used his "official position" to "coerce firemen to participate in the program" by approaching them "during business hours, wearing his official uniform [to] solicit their participation in his campaign efforts." (*Id.* ¶ 18.)

The plaintiff acknowledges that Varble himself had a constitutional right to "express his opinions and advocate for a particular candidate," but, he alleges, Varble "used his official position, while on duty and while on City property" to coordinate a campaign for Hayes and other candidates and against Spencer. (*Id.* ¶ 18.) Varble purportedly carried out this "unlawful campaign effort on Saturdays beginning on or about the first weekend in September," and continuing through election day, November 6, 2018. (*Id.* ¶ 19.) While most firemen campaigned during their days off, time sheets provided by the HFD show that some firemen may have campaigned while on duty.[3]

The campaigning firemen wore shirts that said "Hendersonville Fire," purportedly at Varble's direction. These were not official HFD shirts, however. Varble allegedly knew that the

---

[3] City officials assert that these time sheets are inaccurate. (Doc. No. 36 ¶ 19.) The court assumes, for purposes of the Motions to Dismiss, that the plaintiff's allegations are true and that at least some fireman campaigned against him while on the clock.

public could not tell the difference between the unofficial "Hendersonville Fire" shirts and officially issued uniform shirts and that potential voters would believe that the firemen were acting in their official capacity, even if they were off duty or campaigning in their capacity as union members. Varble directed the firemen to target houses with a pro-Spencer campaign sign in the yard and either instructed them to identify themselves as Hendersonville firemen or did not instruct them that it was mandatory to identify themselves as members of the local firefighters' union. Spencer alleges that "multiple firemen," working on at least eight Saturdays, knocked on the door of every registered voter in Ward 5 and "essentially relayed to such voters that the [HFD] was officially supporting Hayes." (*Id.* ¶ 35.) Varble thus "unduly influence[d] the 2018 election by coercing and/or tricking firemen employed by the City to act with purported authority and thereby deceive citizens that the [HFD] was officially supporting certain candidates and opposing others." (*Id.* ¶ 21.)

The plaintiff further alleges that Varble's efforts were "directed by and/or ratified by City officials with final or policymaking authority," including Bush, who was "fully aware of the political campaign being orchestrated by Varble" and provided support and direction, either directly or indirectly. (*Id.* ¶ 22.) Some aldermen were aware of the project but took no effort to intervene or stop it.

The election was held on November 6, 2018. Spencer lost to Jonathan Hayes by 359 votes. (*Id.* ¶ 35.)

The plaintiff does not allege that he was aware of Varble's efforts to influence the outcome of the election prior to the election. Instead, he states that he "began exploring Varble's campaign efforts" after the election. (*Id.* ¶ 36.) He was told about Varble's commitment to defeat him, and he began to submit public records requests. These requests turned up the text messages between

Varble and Cunningham and phone records showing that Varble communicated with Hayes during working hours. (*Id.*) Spencer apparently asked Hendersonville Mayor Jamie Clary to investigate whether Varble had behaved inappropriately. (*See id.* ¶ 37.) He alleges that the mayor instructed Bush to perform an investigation into whether Varble's campaign efforts were unlawful. Bush claimed that he performed such an investigation. He provided a report to Mayor Clary on April 9, 2019 stating that it was his understanding of City policy that City employees could use City-issued phones for personal business so long as they paid for any overages, which Varble had done on occasion. Bush also reported that Varble would be reprimanded for using a City-issued phone for personal business. Bush issued a "general, oral reprimand" to Varble, but neither he nor the mayor otherwise reprimanded or disciplined Varble or any of the firemen, nor did anyone take steps to change City policy or "prevent such from occurring in the future." (*Id.* ¶ 23.)

Bush's report was also provided to the aldermen. On April 12, 2019, the plaintiff sent an email to each of the aldermen and the mayor in response to Bush's report, pointing out that the investigation consisted of reviewing records that the plaintiff himself had provided and asking the City fireman whether they had engaged in campaign efforts while on duty. The plaintiff also advised the BOMA that (1) "his neighbors had complained to him that the 'Fire Department' was campaigning for his opponent"; (2) Varble had been heard stating that he would do "everything in his power" to ensure that Spencer was not elected; (3) the text messages the plaintiff had obtained through records requests showed that City resources were "used to coordinate a campaign against him"; (4) time sheets showed that at least three firemen had campaigned for Hayes while they were scheduled to work; and (5) he had other public records requests pending and believed that Bush's statement that his investigation was complete was "unfounded and inaccurate." (*Id.* ¶ 24.) Despite this evidence, neither the BOMA nor the mayor took "corrective action." (*Id.*) Specifically, no one

was disciplined and no official policy was enacted to ensure that City employees could not campaign in the future while identifying themselves as City employees.

The plaintiff asked Sumner County District Attorney Ray Whitley to investigate whether any crimes were committed during the "coordination and execution of the unlawful campaign against Plaintiff." (*Id.* ¶ 25.) At a meeting in June 2019, Whitley reported to the plaintiff that he had investigated and that, while he did not intend to pursue criminal charges, "that did not mean that [the] campaign was not in violation of the law or was right." (*Id.*) Whitley opined that it would have been in violation of the "Little Hatch Act" except that the Little Hatch Act did not apply to the City's firemen. Moreover, to the extent that City ordinances or policies might have been violated, it was a matter for the City to pursue. Whitley issued a written statement advising that criminal charges would not be pursued.

At the BOMA meeting immediately following the issuance of Whitley's statement, the plaintiff spoke during the "citizens' comments period," advising the BOMA members of his meeting with District Attorney Whitley and his comment that this was a "City issue and should be handled by the City." (*Id.* ¶ 26.) Regarding Whitley's comments about the "Little Hatch Act," the plaintiff "reminded the members of BOMA that the 'Little Hatch Act' was very similar to the City ordinance [that] prevented City employees from participating in political activities while in their official capacity." (*Id.* ¶ 26.) The plaintiff reported Whitley's comment that the fact that criminal charges would not be pursued did not mean that "what had occurred was right and that 'a lot of education needs to be done' by the City." (*Id.* ¶ 26.) Spencer also reiterated all his prior complaints about Varble, Bush, and the fireman and asked the BOMA, in light of the district attorney's statements, "What will the City do?" (*Id.*) The mayor and several individual aldermen responded that they supported the HFD, had no problem with what had occurred, and did not condemn any

of the "misconduct presented by Plaintiff." (*Id.* ¶ 28.) The BOMA undertook no action to condemn the "unlawful campaign" or even to acknowledge it as unlawful and, instead, effectively ratified and even praised the "unlawful custom or policy." (*Id.*)

Chief Bush responded to the plaintiff's comments. He thanked the BOMA for its support and made it clear that he did not believe the HFD had done anything wrong. In addition, he condemned the questioning of the HFD's actions and integrity and declared that he would not provide the public records the plaintiff continued to seek, namely the corrected time sheets that allegedly showed that firemen were scheduled to work while they were also engaged in campaigning against Spencer. He also "implied that Spencer was not telling the truth." (*Id.* ¶ 39.) The BOMA applauded Bush's speech. (*Id.* ¶ 29.) No further action was taken by the mayor or the BOMA to ensure that the HFD's "unlawful activities" did not recur. (*Id.* ¶ 30.)

Spencer continued making records requests and exercising his constitutional rights to criticize the City and its actions at BOMA meetings, in public settings, and on social media. (*Id.* ¶ 37.) Besides requesting that the City and the district attorney investigate his allegations, he also stated at that he would be filing a federal lawsuit. City aldermen and officials purportedly retaliated against him for these actions. Cunningham made "disparaging and defamatory statements about Spencer on social media," "accused him of pursuing a 'false narrative,'" and claimed that the investigations were a waste of taxpayers' money. (*Id.* ¶ 38.) Other aldermen and City officials also made disparaging and "defamatory" remarks about Spencer in public statements and on social media. These "collective efforts" and comments, including Bush's statements at the BOMA meeting, referenced above, "were defamatory and portrayed Spencer in a false light and caused him mental anguish, embarrassment, humiliation and potential damage to his reputation." (*Id.* ¶ 39.)

The plaintiff further alleges, "[u]pon information and belief," that, at Bush's and/or Varble's direction, the attorney for the local firefighters' union sent Spencer a letter demanding that he stop making public records requests and public statements "in opposition to the government" "or he would be sued." (*Id.* ¶ 40.)

The plaintiff avers that these retaliatory actions would deter "any person of ordinary firmness from making statements against the government or from petitioning the government." (*Id.* ¶ 41.)

The plaintiff asserts that, "but for the illegal campaign against [him] and the undue influence" exercised by "the City . . . as coordinated by Varble," he (Spencer) would have won the election. (Doc. No. 36 ¶ 35.) Although he does not include these claims within an enumerated "Cause of Action," Spencer asserts that Varble's campaign efforts violated Tennessee state law and the Hendersonville Municipal Code. Specifically, he claims that Varble's actions violated Tenn. Code Ann. § 2-19-122 (which makes it unlawful to "demand that any candidate for nomination or office shall promise or agree in advance to support any particular individual, policy or measure, in consideration of the vote or support, financial or moral, of such person, in any election, primary or nominating convention"); Tenn. Code Ann. § 39-16-402(a)(2) (which makes it unlawful for a public servant, "with intent to obtain a benefit or to harm another," to "intentionally or knowingly . . . commit[] an act under the color of office or employment that exceeds the public servant's official power"); Hendersonville Municipal Code § 1-1008 (prohibiting City officials and employees from using or attempting to use their position "to secure any privilege for [themselves] or others" not otherwise authorized by law; and Henderson Municipal Code § 4-218 (prohibiting City employees from engaging in political activity while on duty or acting in an official capacity).

Aside from those claims, the Amended Complaint sets forth five "Counts" or causes of action. Counts I, II, and III each assert a claim under 42 U.S.C. § 1983 against all defendants, based on the alleged violation of the First Amendment, the Due Process Clause of the Fourteenth Amendment. the Ninth Amendment, and Article 1, Section 5 of the Tennessee Constitution (Count I), for retaliation in violation of the First Amendment (Count II), and for violation of the Equal Protection Clause of the Fourteenth Amendment (Count III). Count IV asserts a claim of civil conspiracy among the defendants "and their employees and/or agents" to violate the plaintiff's right to equal protection, in violation of 42 U.S.C. § 1985(e). Count V asserts that the defendants' actions were "intentional, malicious, fraudulent, and/or reckless, thus entitling Plaintiff to punitive damages." (Doc. No. 36 ¶ 74.) The plaintiff reiterates his claim for punitive damages in the prayer for relief. (Doc. No. 36, at 24.)

Following the filing of the Amended Complaint, Paul Varble filed a Motion to Dismiss and supporting Memorandum (Doc. Nos. 39, 40), seeking dismissal of all claims asserted against him in his individual capacity, and the other defendants filed a separate Motion to Dismiss and Memorandum of Law (Doc. Nos. 41, 42), seeking dismissal of the claims against the City and against Bush and Varble in their official capacities. The plaintiff has filed Responses in opposition to both motions (Doc. Nos. 51, 53),[4] and Varble filed a Reply (Doc. No. 55).

---

[4] The plaintiff actually filed four separate documents: a single-page (not counting the signature and certificate of service) "Response" to each motion (Doc. Nos. 50, 52) and a separate "Memorandum of Law in Opposition" to each motion (Doc. Nos. 51, 53). The filing of a separate response and memorandum in response to each motion was unnecessary. Although the court's Local Rules require that every *motion* requiring resolution of an issue of law "be accompanied by a separately filed memorandum of law," L.R. 7.01(a)(2), this requirement does not pertain to *responses*. *See* L.R. 7.01(a)(3) ("[A]ny party opposing a motion must serve and file a memorandum of law in response . . . .").

## II.    STANDARD OF REVIEW

The defendants seek dismissal of the claims against them under Rule 12(b)(6) of the Federal Rules of Civil Procedure. In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action"; instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556. According to the Supreme Court, "plausibility" occupies that wide space between "possibility" and "probability." *Iqbal*, 556 U.S. at 678. If a reasonable court can draw the necessary inference from the factual material stated in the complaint, the plausibility standard has been satisfied.

### III. DISCUSSION

As indicated above, Varble seeks dismissal of the claims asserted against him in his individual capacity. A separate motion seeks dismissal of the claims against the City and Varble and Bush in their official capacities. As an initial matter, the court notes that any claims against Varble and Bush in their official capacities are equivalent to, and redundant of, claims against the City itself. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."); *id.* at 167 n.14 (1985) ("There is no longer a need to bring official-capacity actions against local government officials, for under *Monell*, local government units can be sued directly for damages and injunctive or declaratory relief." (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978))). Accordingly, the court will dispense with reference to the official-capacity claims. Any arguments raised by the City pertain equally to the claims against Varble and Bush in their official capacities, and the dismissal of any claim against the City automatically entails dismissal of the equivalent official-capacity claim.

The court will address first those arguments that are raised in, and apply equally to, both motions: whether the Amended Complaint states colorable claims under state law and 42 U.S.C. § 1985(3) (Count IV), and whether the § 1983 claims (Counts I–III) are barred by the statute of limitations. Finding that the state law claims and Count IV are subject to dismissal but that Counts I through III are not barred by the statute of limitations, the court will then address the substantive arguments seeking dismissal of those claims under Rule 12(b)(6). Concluding that these claims must be dismissed for failure to state a claim for which relief may be granted, the court will not address the arguments for dismissal of Count V, the stand-alone claim for punitive damages, since all damages claims are rendered moot by the conclusion that the defendants are not liable.

### A.  Claims Based on State Law

Varble argues that the plaintiff did not specifically set out causes of action based on alleged violations of the Tennessee Constitution, Tennessee statute, and Hendersonville Municipal Code (collectively, the "state law provisions"), but, "out of an abundance of caution," he moves to dismiss any cause of action that may be construed to arise from paragraphs 32 and 33 of the Amended Complaint. (Doc. No. 40, at 21.) The City incorporates by reference Varble's arguments regarding these claims. (Doc. No. 42, at 1 n.1.)

The defendants argue, in short, that none of the state law provisions creates or permits private causes of action based on their violation, as a result of which any related claims must be dismissed. In his Response, the plaintiff does not actually refute the defendants' argument in that regard. Instead, he insists that he does not seek damages for violations of the state law provisions. Instead, he seeks only a declaratory judgment under 28 U.S.C. § 2201 that the defendants' past actions violated the state law provisions. (*See* Doc. No. 36, at 23.) He maintains that the court has the authority to issue such a declaratory judgment. (Doc. No. 53, at 27.)

Section 2201, titled "Creation of Remedy," authorizes a court, "[i]n a case of actual controversy within its jurisdiction," to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. The statute, however, permits relief only to the extent it is "consonant with the exercise of the judicial function in the determination of controversies to which under the Constitution the judicial power extends." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240 (1937). "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Md. Casualty Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941). Courts have frequently held, for example, that an individual

threatened with prosecution under a statute that he believes to be unconstitutional may bring a declaratory judgment action to have the statute declared unconstitutional. *See, e.g.*, *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (finding that justiciability exists where the plaintiff's "challenge is to those specific provisions of (federal) law which have provided the basis for threats of criminal prosecution"); *see also* 10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice & Procedure § 2757 (1983) ("Thus, when the threat of prosecution under a challenged statute is real, a declaratory judgment on the constitutionality of the statute is appropriate." (footnotes and citations omitted)).

More to the point, however, the law is clear that, in the context of a declaratory judgment action, "allegations of past injury alone are not sufficient to confer standing. The plaintiff must allege and/or demonstrate actual present harm or a significant possibility of future harm." *Fieger v. Ferry*, 471 F.3d 637, 643 (6th Cir. 2006) (quoting *Peoples Rights Org., Inc. v. City of Columbus*, 152 F.3d 522, 527 (6th Cir. 1998)); *see also O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief"). As the Sixth Circuit has remarked, "Article III standing ultimately turns on whether a plaintiff gets something (other than moral satisfaction) if the plaintiff wins." *Drutis v. Rand McNally & Co.*, 499 F.3d 608, 612 (6th Cir. 2007). "[S]tanding to sue is—of course—an issue that may be raised and/or considered at any time." *Fieger*, 471 F.3d at 643.

The court finds that the plaintiff lacks standing to seek a declaration that the defendants' past acts violated the state law provisions. He does not allege that he continues to be affected by the allegedly unlawful actions, nor does he allege a likelihood that he will be affected by continued violations in the future. *Accord Bennett v. Metro. Gov't*, 383 F. Supp. 3d 790, 809 (M.D. Tenn. 2019) (Richardson, J.) (dismissing a claim for a declaratory judgment that the defendant

municipality's social media policy violated the plaintiff's rights under the Fourteenth Amendment "because, as a former employee, she is no longer affected by the challenged policies"); *see also Golden v. Zwickler*, 394 U.S. 103, 109 (1969) (finding that the appellee Zwickler, a former congressman, lacked standing to seek a declaratory judgment that a New York statute prohibiting anonymous handbills directly pertaining to election campaigns was unconstitutional, even though Zwickler had once been convicted under the statute, because he was no longer a Congressman apt to run for re-election, despite Zwickler's assertion that he could be a candidate for Congress again).

It is clear in this case that the only thing the plaintiff has to gain in obtaining the requested declaratory relief is moral satisfaction, which is not a sufficient basis for a declaration under § 2201. The plaintiff's claims for declaratory relief based on alleged violations of the state law provisions will be dismissed without prejudice for lack of standing.[5] *See Thompson v. Love's Travel Stops & Country Stores, Inc.*, 748 F. App'x 6, 11 (6th Cir. 2018) (affirming dismissal for lack of standing but remanding for entry of an order dismissing claims without prejudice rather than with prejudice).

### B.    Count VI—Claim under 42 U.S.C. § 1985(3)

Section 1985(3) creates a cause of action based on a conspiracy to deprive a person or class of persons of the equal protection of the laws. Varble and the City both seek dismissal of the

---

[5] Even if the plaintiff plausibly alleged future injury sufficient to establish standing, the court would decline to consider the claims. *See Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995) (noting that, even when a court clearly has jurisdiction of a suit under § 2201 "it [i]s under no compulsion to exercise that discretion"). Considering the factors for whether to exercise such discretion established by the Sixth Circuit, a judgment that the defendants' actions violated the state law provisions would unnecessarily embroil the court in the consideration of state criminal law, and it would not settle the controversy, because the plaintiff's claims for damages center on alleged violations of his federal constitutional rights. A declaration that the defendants violated state and local law, even if appropriate, would not resolve the question of whether they also violated the plaintiff's constitutional rights.

plaintiff's claim under § 1985(3) on two grounds: (1) that a claimant seeking relief under § 1985(3) must allege that he is a member of a protected class and that the alleged conspiracy was motivated by racial or other class-based animus, which the plaintiff here cannot do; and (2) the claim is barred by the "intra-corporate conspiracy doctrine." (*See* Doc. No. 40, at 19–20; Doc. No. 42, at 16–17.) The plaintiff does not respond to these arguments or make any attempt to defend against dismissal of this claim.

It is clear, as the defendants assert, that, "[t]o sustain a claim under section 1985(3), a claimant must prove both membership in a protected class and discrimination on account of it." *Estate of Smithers v. City of Flint*, 602 F.3d 758, 765 (6th Cir. 2010) (citing *Bartell v. Lohiser*, 215 F.3d 550, 559 (6th Cir. 2000)). Because the plaintiff here does not allege either, the Amended Complaint fails to state a claim under § 1985(3). This claim is subject to dismissal under Rule 12(b)(6).

### C.     Counts I, II and III—Section 1983 Statute of Limitations

Varble specifically argues that the plaintiff's claims under § 1983 are barred by the statute of limitations. (Doc. No. 40, at 8.) The City incorporates by reference this argument, without reiterating it. (Doc. No. 42, at 1 n.1.) In response, the plaintiff concedes that his § 1983 claims are subject to the one-year statute of limitations set forth in Tenn. Code Ann. § 23-3-104(a)(1)(A). He maintains, however, that (1) many of the actions giving rise to the retaliation claim occurred *after* the election and, therefore, well within the limitations period; (2) the Amended Complaint clearly alleges that defendant Varble's allegedly wrongful conduct took place up until the date of the election, November 6, 2018, such that the claims as asserted in the original Complaint filed on November 4, 2019 are timely under the continuing violations doctrine; and (3) in any event, the statute of limitations did not begin to run until the plaintiff knew or had reason to know of his claims, which did not occur until sometime after the election.

Section 1983 does not have its own statute of limitations, so courts look to applicable state law to determine what limitation period applies. *Roberson v. Tennessee*, 399 F.3d 792, 794 (6th Cir. 2005). In Tennessee, "[c]ivil actions for compensatory or punitive damages, or both, brought under the federal civil rights statutes," including § 1983, have a one-year limitations period. Tenn. Code Ann. § 28-3-104(a)(1)(A). The accrual of a cause of action under § 1983, however, is governed by federal law. *Wallace v. Kato*, 549 U.S. 384, 388 (2007). And "it has been well established that a § 1983 federal civil rights claim accrues 'when the plaintiff knows or has reason to know of the injury which is the basis of his action.'" *Johnson v. Memphis Light Gas & Water Div.*, 777 F.3d 838, 843 (6th Cir. 2015) (quoting *Roberson*, 399 F.3d at 794). As the Sixth Circuit has stated:

> A plaintiff has reason to know of his injury when he should have discovered it through the exercise of reasonable diligence. In this objective inquiry, courts look to what event should have alerted the typical lay person to protect his or her rights. At that point, the plaintiff has a complete and present cause of action, such that he can file suit and obtain relief.

*Id.* (internal quotation marks and citations omitted).

It also bears mentioning that a motion to dismiss is "generally an inappropriate vehicle for dismissing a claim based upon the statute of limitations." *Jodway v. Orlans, PC*, 759 F. App'x 374, 379 (6th Cir. 2018) (quoting *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012)). This is because the statute of limitations is an affirmative defense, for which the defendant bears the burden of proof. *Id.* Accordingly, a motion to dismiss on statute of limitations grounds should only be granted "if the allegations in the complaint affirmatively show that the claim is time-barred." *Id.* (quoting *Lutz v. Chesapeake Appalachia, L.L.C.*, 717 F.3d 459, 464 (6th Cir. 2013)).

The plaintiff here filed his original Complaint on November 4, 2019, so, to proceed, his claims must have accrued within the year preceding that date. Regarding his First Amendment

retaliation claims, the Amended Complaint clearly alleges that at least some of the conduct the plaintiff claims to be retaliatory happened in response to his open records requests, requests for investigations into Varble's conduct, criticism of the City government, and his stated intention to file a federal lawsuit. All of those events took place after the election on November 6, 2018, as did the purportedly retaliatory conduct. The plaintiff's First Amendment retaliation claim based on those events clearly is not barred by the one-year statute of limitations.

Regarding the claims based on campaign activities that allegedly took place beginning in August 2017 and continuing through October 18, 2017, the defendants assert that the plaintiff "knew or should have known" about these actions "prior to the actual election." (Doc. No. 40, at 10.) The plaintiff responds that, as alleged in the Amended Complaint, he lost his election by a very small margin to a candidate who entered the race just a few months before the election and eight months after he did. This combination of factors "raised concerns about the fairness of the election" (Doc. No. 53, at 15), which caused the plaintiff to begin "exploring Varble's campaign efforts." (Doc. No. 36 ¶ 36.) After the election, he "made numerous records requests," the results of which he believes constitute evidence that Varble "unduly and illegally affected the election." (*Id.*)

The plaintiff's allegations, construed in the light most favorable to him, indicate that he did not become aware of the purportedly illegal activity until after the election and after he began to obtain documents in response to his open records requests. Dismissal of any claims on statute of limitations grounds, at this juncture, is not warranted.

### D. Count I

Under Count I of the Amended Complaint, Spencer asserts claims under 42 U.S.C. § 1983 based on the defendants' alleged violation of his constitutional rights. He asserts that he has a "fundamental right under the First Amendment and the Ninth Amendment to pursue any common

occupation of life [and] the right to seek political office without undue government influence." (Doc. No. 36 ¶ 44.) He quotes the Fourteenth Amendment as prohibiting the States from "depriv[ing] any person of life, liberty, or property, without due process of law" (Doc. No. 36 ¶ 42), but the Amended Complaint does not otherwise specifically invoke any particular fundamental right guaranteed by the Fourteenth Amendment that was violated by the defendants' conduct. The defendants seek dismissal of these claims under Rule 12(b)(6) on the basis that the plaintiff's allegations fail to show that his rights were violated. In addition, Varble asserts that he is entitled to qualified immunity, because even if the plaintiff could show that a right was violated, such right was not clearly established at the time of the events. The City asserts that the allegations in the Amended Complaint fail to establish a basis for municipal liability.

1. *Legal Standards*

Section 1983 states, in relevant part, that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

Thus, to state a claim under 42 U.S.C. § 1983, a plaintiff must allege (1) "a deprivation of a right secured by the Constitution or laws of the United States" and (2) that "the deprivation was caused by a person acting under color of state law." *Tahfs v. Proctor*, 316 F.3d 584, 590 (6th Cir. 2003) (citation omitted).

Although § 1983 appears straightforward enough, the doctrine of qualified immunity complicates its application. Once the defense is raised, "the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity." *United Pet Supply, Inc. v. City of Chattanooga*, 768 F.3d 464, 478 (6th Cir. 2014). "Qualified immunity shields [government] officials from money damages unless a plaintiff pleads facts showing (1) that the official violated

a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citation omitted). Courts have discretion to decide which of the two prongs of qualified-immunity analysis to decide first. *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

Qualified immunity is not an available defense in a suit against a municipality. *United Pet Supply*, 768 F.3d at 484. Moreover, a determination that an individual defendant is protected by qualified immunity does not automatically excuse a municipal defendant from constitutional liability. *See Scott v. Clay Cty.*, 205 F.3d 867, 879 (6th Cir. 2000) ("[I]f the legal requirements of municipal or county civil rights liability are satisfied, qualified immunity will not automatically excuse a municipality or county from constitutional liability, even where the municipal or county actors were personally absolved by qualified immunity, if those agents in fact invaded the plaintiff's constitutional rights."). In other words, it is possible that Varble could be entitled to qualified immunity for his actions while the City itself could still be held liable.

While it is well established that a municipality may be a "person" for purposes of liability under § 1983, to state a claim against a municipality, a plaintiff must allege facts showing that "the municipality's policy or custom caused the alleged injury." *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006) (citing *Monell*, 436 U.S. at 690–91); *see also Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013) ("The plaintiff must 'demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the injury alleged.'" (quoting *Bd. of Comm'rs v. Brown*, 520 U.S. 397, 404 (1997))).

2. *Analysis*

Under *Pearson v. Callahan*, the court has the discretion, for purposes of Varble's qualified immunity defense, to consider whether the rights the plaintiff alleges were violated were "clearly established" at the time of the challenged conduct before reaching (if necessary) the question of

whether a constitutional violation occurred at all. 555 U.S. at 236. Nonetheless, because a grant of qualified immunity would not obviate consideration of the latter question for purposes of determining whether the City is liable, the court finds that it is more efficient to consider first the question of whether the plaintiff has adequately alleged a violation of his constitutional rights.

*The Claim for Violation of the Ninth Amendment*

The first problem with the claim asserted in Count I is that the Sixth Circuit has expressly held that the Ninth Amendment "does not confer substantive rights in addition to those conferred by other portions of our governing law." *Gibson v. Matthews*, 926 F.2d 532, 537 (6th Cir. 1991). "This amendment was added to the Bill of Rights to ensure that the maxim *expressio unius est exclusio alterius* would not be used at a later time to deny fundamental rights merely because they were not specifically enumerated in the Constitution." *Id.* (quoting *Charles v. Brown*, 495 F. Supp. 862, 863–64 (N.D. Ala. 1980)); *see also Jenkins v. Commissioner*, 483 F.3d 90, 92 (2d Cir. 2007) ("The Ninth Amendment is not an independent source of individual rights; rather, it provides a 'rule of construction' that we apply in certain cases.").

Moreover, because it does not actually embody any specific rights, the few courts that have considered the question have held that the Ninth Amendment does not contain any specific rights that were incorporated into the Fourteenth Amendment and thus made applicable to the states. *See, e.g.*, *Charles*, 495 F. Supp. at 863 ("There is ample authority for the principle that provisions expressing fundamental personal rights and found within the first eight amendments to the Constitution have in effect been incorporated into the Fourteenth Amendment and thereby been made applicable to the states. *There is no authority, however, stating that the Ninth Amendment has been absorbed by this process*." (emphasis added)); *see also Griswold v. Connecticut*, 381 U.S. 479, 492 (1965) (Goldberg, J., concurring) ("I do not mean to imply that the Ninth

Amendment is applied against the States by the Fourteenth. Nor do I mean to state that the Ninth Amendment constitutes an independent source of rights protected from infringement by either the States or the Federal Government.").

Accordingly, to the extent the plaintiff intends to state a claim for violation of any right guaranteed by the Ninth Amendment, such a claim fails simply because the Ninth Amendment does not guarantee any particular right, much less any right that is applied against the States by the Fourteenth Amendment. The court will dismiss any claim purportedly brought for violations of the Ninth Amendment.

<u>*The Claim for Violation of the Fourteenth Amendment*</u>

The Due Process Clause of the Fourteenth Amendment states that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const., amend. XIV, § 1. This clause has both procedural and substantive components. *Schulkers v. Kammer*, 955 F.3d 520, 539 (6th Cir. 2020). "[P]rocedural due process principles protect persons from deficient procedures that lead to the deprivation of cognizable liberty interests [while] substantive due process provides that, irrespective of the constitutional sufficiency of the processes afforded, government may not deprive individuals of fundamental rights unless the action is necessary and animated by a compelling purpose." *Id.* The "fundamental rights and liberty interests" protected from governmental interference by substantive due process include "the specific freedoms protected by the Bill of Rights" as well as the right to marry, have children, direct the education and upbringing of those children, marital privacy, the use of contraception, bodily integrity, and abortion. *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). The Sixth Circuit has acknowledged that substantive due process also protects individuals from "government actions that 'shock the conscience'" and confers the rights to "reasonable care and safety while in government custody"

and to "travel locally through public spaces and roadways." *Bell v. Ohio State Univ.*, 351 F.3d 240, 250 (6th Cir. 2003) (citations omitted). The Supreme Court has "always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Glucksberg*, 521 U.S. at 720 (citation omitted).

Regarding the Fourteenth Amendment, Varble, first, construes the Amended Complaint as stating a substantive due process claim but argues for its dismissal by citing cases that pertain to procedural due process. Specifically, he quotes *Wilson v. Birnberg*, 667 F.3d 591 (5th Cir. 2012), for the proposition that the "unlawful denial by state action of a right to state political office is not a denial of a right of property or liberty secured by the due process clause." (Doc. No. 40, at 6 (quoting *Wilson*, 667 F.3d at 597).) In *Wilson*, the Fifth Circuit held that the plaintiff had no *property* right to be a political candidate or to run for office for purposes of a *procedural* due process claim. *See Wilson*, 667 F.3d at 598. The plaintiff here is not attempting to bring a procedural due process claim, so *Wilson* is irrelevant.

The City argues that any substantive due process claim under the Fourteenth Amendment is redundant, or duplicative, of the claim under the First Amendment. This argument strikes somewhat closer to the mark. As indicated above, the scope of the substantive due process clause is relatively narrow and does not appear to have been expanded to embrace the rights the plaintiff claims here, except insofar as those rights are already incorporated in the Bill of Rights, which includes the First Amendment. It is clear that, to the extent Spencer has stated a claim for violation of any substantive rights, such rights fall within the scope of the First Amendment, as discussed below. Thus, to the extent Count I might be construed to state a substantive due process claim, any such claim is redundant.

Moreover, it is not clear to the court that the plaintiff intended to state a claim at all under

Count I for violation of his due process rights under the Fourteenth Amendment. As indicated above, he quotes the Due Process Clause but does not actually assert that the defendants violated any right created thereby. The court therefore understands the Amended Complaint to invoke the Fourteenth Amendment's Due Process Clause in Count I only because it is through that clause that the protections contained in the Bill of Rights were made applicable to the States. *See Timbs v. Indiana*, 139 S. Ct. 682 (2019) ("Incorporated Bill of Rights guarantees are 'enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment.'" (quoting *McDonald v. Chicago*, 561 U.S. 742, 765 (2010)). (*See* Doc. No. 36 ¶ 42 ("The Due Process Clause of the Fourteenth Amendment of the U.S. Constitution states: "No state shall . . .deprive any person of life, liberty, or property, without due process of law . . .").)

The court finds, in short, that Count I does not articulate a violation of the Due Process Clause of the Fourteenth Amendment and, to the extent it was intended to, that any claim under the Fourteenth Amendment is duplicative of the claim asserted for violation of the First Amendment.

### The Claim for Violation of the First Amendment

This brings the court to the actual crux of the matter, which is whether the plaintiff has stated a claim for violation of his rights under the First Amendment, caused by a person acting under color of state law. *Tahfs*, 316 F.3d at 590.

Varble first argues that the Amended Complaint fails to allege sufficient facts to show that Varble was acting in his capacity as a "state actor," that is, as Fire Marshal, for purposes of a claim under § 1983 and that the "facts alleged more strongly suggest that [he] was acting in his capacity as a Union official, on behalf of the [local firefighters' union], and as a private citizen." (Doc. No.

40, at 13.) He also asserts that the Amended Complaint fails to allege facts showing that he "coerced" other firefighters to help with campaign efforts or that the campaign misled any of the citizens with whom the firefighters interacted. (*Id.*) Citing *Carver v. Dennis*, 104 F.3d 847 (6th Cir. 1997), the City further argues that the plaintiff has not established the violation of a right, because the Sixth Circuit does not recognize a right to run for political office. And Varble argues that, in any event, the plaintiff does not allege facts showing that anyone actually interfered with his First Amendment rights.

The court readily rejects Varble's argument that the plaintiff has not alleged conduct by a person acting under "color of state law." The Amended Complaint clearly alleges that Varble engaged in the allegedly wrongful activities while wearing his Fire Marshal uniform, during working hours, and using public facilities, including his office, desk, and City-issued telephone. In general, a public official acts under color of state law when he has "exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)); *see also Waters v. City of Morristown*, 242 F.3d 353, 359 (6th Cir. 2001) ("Section 1983 is generally not implicated unless a state actor's conduct occurs in the course of performing an actual or apparent duty of his office, or unless the conduct is such that the actor could not have behaved as he did without the authority of his office." (citing *West*, 487 U.S. at 49–50)). The allegations here, construed in the light most favorable to the plaintiff, would permit a jury to conclude that Varble exercised power that he possessed by virtue of his position as Fire Marshal and that he undertook actions only made possible because he was cloaked with the authority inherent in that position. At this juncture, these allegations are sufficient to establish that Varble was acting under "color of state law."

The more difficult question is whether the plaintiff can establish the first prong of a claim under § 1983: a claim for violation of his rights under the First Amendment. That prong actually encompasses two requirements. The plaintiff must first establish that he was engaged in activity protected by the First Amendment; then, if so, he must also establish that Varble interfered with his exercise of his rights. In his Response to Varble's Motion to Dismiss, the plaintiff summarizes his claim against Varble individually as based on allegations that Varble "intentionally violated state and local law by coordinating a campaign during work hours and using City resources against Plaintiff because of [his] political views," thus violating the plaintiff's "clearly established right to run for office without unlawful government interference." (Doc. No. 53, at 18.) More specifically, Spencer claims that Varble, while attending a BOMA meeting "in his official capacity as Fire Marshall wearing his uniform and speaking in his capacity as a Fire Marshall," told someone that he would "do anything" to prevent Spencer from being elected. (Doc. No. 36 ¶ 11.) While on duty and using his City-issued phone, office, and desk, Varble allegedly talked and met with various aldermen and agreed to throw the weight of the HFD behind their campaigns in exchange for their promises to support projects and issues important to the HFD—including pay raises for firemen and new administrative offices—and he undertook to provide such support by "coercing" HFD employees to campaign door-to-door while wearing "Hendersonville Fire" shirts and without instructing them that they needed to make it clear that they were campaigning as members of the local union and not as City employees. (Doc. No. 36 ¶¶ 18, 20.)

The First Amendment to the United States Constitution provides that Congress "shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. Amend. I. The First Amendment has been recognized to protect several rights associated with the political

process, including the right to a meaningful or effective vote, *see Williams v. Rhodes*, 383 U.S. 23, 30–31 (1968), and freedom of association—specifically political association and the "right to form a party for the advancement of political goals." *Id.* at 31. In *Williams*, the Court held that the latter right "would "mean[] little if a party can be kept off the election ballot and thus denied an equal opportunity to win votes." *Id.* Political expression is a "core" First Amendment right, interference with which is subject to "exacting scrutiny." *Buckley v. Valeo*, 424 U.S. 1, 44–45 (1976).

The Supreme Court has not directly addressed the issue, but several circuit courts of appeal have held that citizens have a constitutionally protected right to run for public office. *See, e.g.*, *Phillips v. City of Dallas*, 781 F.3d 772, 778 (5th Cir. 2015) ("[B]ecoming a candidate for political office is within the First Amendment's ambit and therefore constitutes speech on a matter of public concern."); *Cook v. Randolph Cty.*, 573 F.3d 1143, 1157 (11th Cir. 2009) ("Voting rights and the right to run for public office are core constitutional rights."). The Sixth Circuit, however, is not among these. To the contrary, our circuit has repeatedly concluded that there is no constitutionally protected right, *per se*, to run for office.

In *Carver v. Dennis*, a deputy county clerk was fired by the county clerk for announcing that she would run in the election for county clerk against her boss. She brought suit alleging that her termination violated her First Amendment right to engage in political activity—that is, to run for office. The Sixth Circuit affirmed summary judgment for the defendant. First, the court noted that the plaintiff did not allege that she was fired based on her political beliefs; rather, she was dismissed only because she was a candidate (and rival to her boss), "which is a different matter." 104 F.3d at 850. Observing that that the Supreme Court had "never recognized a fundamental right to express one's political views through candidacy," *id.* at 850–51, the Sixth Circuit held that the plaintiff's claims did not implicate her rights under the First Amendment, stating,

To hold otherwise, on the facts of this case, would be to read out of the entire line of relevant Supreme Court precedent the factual requirements of political belief, expression and affiliation, partisan political activity, or expression of opinion, and to read into that precedent a fundamental right to candidacy.

*Id.* at 853. The Sixth Circuit has continued to reaffirm *Carver*'s holding that the right to run for political office, *per se*, is not constitutionally protected. *See, e.g.*, *Greenwell v. Parsley*, 541 F.3d 401, 402–03 (6th Cir. 2008); *Myers v. Dean*, 216 F. App'x 552, 554–55 (6th Cir. 2007).[6]

Here, although the plaintiff references a purported "right to run for office," the facts as actually alleged indicate that the case is not simply about the right to run for office but, instead, about an alleged effort by government officials to interfere with the plaintiff's campaign specifically because of the political views he espoused—his "small government, anti-corruption" platform that led him to oppose funding the new administrative offices for the HFD and pay raises for firemen. As such, the case falls outside the scope of *Carver*, as made evident by *Carver*'s expressly distinguishing the facts before it from those in *Newcomb v. Brennan*, 558 F.2d 825 (7th Cir. 1977). In *Newcomb*, the Seventh Circuit, like the Sixth, declined to recognize a First Amendment right to seek public office. 558 F.2d at 829. However, *Newcomb* was not just about a right to run for office; it was "a case where the plaintiff's candidacy was burdened because a state official wished to discourage that candidacy in particular," due to the fact that the officials wished to discourage his particular political views. *Id.* The court found that the "plaintiff's interest in running for Congress and thereby expressing his political views without interference from state officials who wished to discourage the expression of those views lies at the core of the values

---

[6] In *Parsley*, Judge Boyce Martin wrote a separate concurrence to emphasize that he concurred in the judgment only because the case was indistinguishable on the facts from *Carver*, which therefore controlled its resolution. However, he pointed out that *Carver*, in his opinion, was based on two Supreme Court opinions "that do not support its final conclusion," and he expressed hope that the Sixth Circuit would "revisit this critical First Amendment issue en banc." *Parsley*, 541 F.3d at 405–06 (Martin, J.). It has never done so.

protected by the First Amendment." *Id.* at 829.

The Sixth Circuit, too, has recognized such a distinction. In *Murphy v. Cockrell*, 505 F.3d 446 (6th Cir. 2007), the court again recognized that it was bound by *Carver*'s holding that the First Amendment does not guarantee a right to run for office, but it distinguished the facts of the case before it on the basis that the plaintiff, another public employee, was terminated from her position, not because of the fact that she ran for political office, but because of the political views she expressed during her campaign and candidacy. *Id.* at 449. The plaintiff alleged on that basis that her termination violated her First Amendment rights to free speech and free association. Because the plaintiff in *Murphy* alleged that she was terminated for her political views rather than her candidacy, the court found that the case did not fall within the scope of *Carver* and that the plaintiff's "speech during the course of her campaign is protected under the First Amendment." *Id.* at 452.[7]

None of these cases is precisely on point, because Spencer does not allege that he was ever a public employee or terminated from his employment because he ran for political office or expressed political views. Rather, he claims that government officials, acting in their capacity as government officials, interfered with his political campaign because of his political views. However, it seems that the fact that he was not a government employee simply means that, if his rights were violated, the court would have no need to conduct a balancing inquiry to determine whether the government's interest in running an efficient public service outweighed his free-

---

[7] Having found that the plaintiff's speech during her campaign was protected, the court went on to perform the balancing test outlined in *Pickering v. Board of Education*, 391 U.S. 563, 574 (1968), to determine whether the plaintiff's free speech interests outweighed the defendant's interest in maintaining an efficient public service and ultimately found that it was not, that the defendant was not entitled to qualified immunity, and that the district court had erred in dismissing the plaintiff's claim. *Murphy*, 505 F.3d at 452–54.

speech interest. (*See* Note 7, *supra*.) Otherwise, the fact that Spencer invokes, not only a purported right to run for political office, but more specifically his right to advance political ideas and to campaign to promote such ideas, which has been recognized as fundamental, brings his case within the scope of *Murphy* and *Newcomb* rather than *Carver*. *See Newcomb*, 558 F.2d at 828 ("[S]tate action which denies individuals the freedom to form groups for the advancement of political ideas, as well as the freedom to campaign and vote for the candidates chosen by those groups, is unconstitutional absent a strong subordinating interest." (quoting *Bullock*, 405 U.S. at 142–43, and citing *Buckley*, 424 U.S. at 39–59, and *Williams*, 393 U.S. 23)). The court therefore finds, for purposes of one half of the first prong of the § 1983 analysis, that the plaintiff, by expressing certain political views during his campaign, engaged in activity protected by the First Amendment.

The second half of this prong of the § 1983 claim requires a showing that the defendants violated that right. The defendants argue that, even assuming that the plaintiff engaged in protected activity, and assuming that the facts as alleged in the Amended Complaint are true, these facts do not establish that Varble, as a government official, actually interfered with the plaintiff's right of political expression. Spencer does not allege, for instance, that he was prevented from campaigning. Instead, he alleges only that Varble effectively campaigned against him (and persuaded others to campaign against him) by going door to door within Ward 5 and persuading voters not to vote for him.

The court finds that the plaintiff has not alleged a violation of his First Amendment rights. The plaintiff, notably, does not allege that Varble or anyone else misrepresented the plaintiff's views (or their own) in order to thwart Spencer's campaign. Moreover, the plaintiff does not allege that he was kept off the ballot or prevented from announcing his candidacy. He does not allege actual interference with his own right to campaign, his right to express his political views, or his

right to political association. Instead, he alleges that Varble used public resources to promote other candidates without actually interfering with the plaintiff's own ability to campaign and spread his own message. He also implies that Varble promised other candidates that he would campaign— and get HFD firemen to campaign—in support of the other candidates in exchange for their agreement to promote projects important to firefighters. The court does not condone Varble's (alleged) conduct, and it may well have violated state and local law, as the plaintiff alleges. The operative question, however, is whether the conduct violated the First Amendment. With regard to that question, the court cannot find that Varble's alleged conduct interfered with the plaintiff's own exercise of his protected right to express his political opinions or to engage in any other conduct protected by the First Amendment.[8]

Consequently, the Amended Complaint fails to state a colorable claim against Varble for violation of the plaintiff's rights under Count I, under the Ninth, Fourteenth, or First Amendment. Because the plaintiff has not established a substantive violation of his rights, he also fails to state a municipal-liability claim against the City. The court will dismiss the claims under Count I of the Amended Complaint without reaching the questions of whether some City policy or custom was implicated in the purported constitutional violation.[9]

---

[8] The court recognizes that, pursuant to the very nature of that United States Constitution and § 1983, conduct undertaken by public officials may violate constitutional rights while identical conduct undertaken by private individuals (or even public officials acting in their private capacity) typically does not. Thus, to cite an obvious example, an unprovoked assault by a police officer on an unarmed and compliant suspect may well violate the suspect's constitutional rights while the same assault by a private citizen is just an assault, perhaps criminal in nature but not a constitutional violation. The alleged conduct here, when undertaken by private individuals, is not criminal, however, and, instead, is proactively *protected* by the Constitution—the right to express political views and to campaign for or against a political candidate.

[9] The court also notes that, even if the plaintiff had established a violation of his rights, Varble would be entitled to qualified immunity, because it was not clearly established at the time of his actions that campaigning for or against candidates running for alderman positions while on

### E.     Count II—First Amendment Retaliation

####    *1.    Legal Standards*

To state a colorable claim for First Amendment retaliation, the plaintiff must allege facts showing that: (1) he engaged in constitutionally protected conduct; (2) the defendants took an adverse action against him that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated at least in part by his protected conduct. *Marie v. Am. Red Cross*, 771 F.3d 344, 360 (6th Cir. 2014) (citing *Wurzelbacher v. Jones–Kelley*, 675 F.3d 580, 583 (6th Cir. 2012).

As for the second element, an adverse action is "one that would 'deter a person of ordinary firmness' from the exercise of the right at stake." *Thaddeus-X v. Blatter*, 175 F.3d 378, 395 (6th Cir. 1999) (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)). The test is objective, but it "is not static across contexts." *Id.* at 398. Thus, for example, "[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average citizens, before an action taken against them is considered adverse." *Id.* In any context, "trivial actions" that are of "de minimis" significance are not sufficiently adverse. *Id.* However, "this threshold is intended to weed out only inconsequential actions, and is not a means whereby solely egregious retaliatory acts are allowed to proceed past summary judgment." *Id.* "[S]ince there is no justification for harassing people for exercising their constitutional rights [the effect on freedom of speech] need not be great in order to be actionable." *Id.* at 397 (quoting *Bart*, 677 F.2d at 625). Further, whether the actual plaintiff was "chilled" to inaction is not relevant; the standard looks to the firmness of an "ordinary" person. *Holzemer v. City of Memphis*, 621 F.3d 512, 520 (6th Cir.

---

City time and using City facilities would violate another's rights under the First Amendment, regardless of whether the conduct violated state criminal laws.

2010).

 As the Sixth Circuit has noted, there are few cases addressing First Amendment retaliation claims brought by plaintiffs who are neither public employees nor prisoners. *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 724 (6th Cir. 2010). In *Fritz*, the court found that an action that threatened a private citizen's economic livelihood constituted an "adverse action." *See id.* at 725 (finding that the plaintiff sufficiently alleged an adverse action where the defendant denied the plaintiff's requests for zoning and signage variances in connection with her home business and threatened her business relationship with her employer); *see also Holzemer*, 621 F.3d at 524–25 (finding that the defendant's intentional delay in issuing the permits necessary for the plaintiff to continue to operate his business constituted an "adverse action"). A school official's filing a report alleging child abuse was considered sufficiently "adverse," given that such a report would have "'powerfully dissuasive' consequences that would lead reasonable parents to refrain from engaging in protected activity." *Wenk v. O'Reilly*, 783 F.3d 585, 595 (6th Cir. 2015) (citing *A.C. ex rel. J.C. v. Shelby Cty. Bd. of Educ.*, 711 F.3d 687, 698 (6th Cir. 2013)). Allegedly defamatory statements might be sufficiently adverse, depending on the context. *Compare Bloch v. Ribar*, 156 F.3d 673 (6th Cir. 1998) (finding that a sheriff who used a press conference to publicize confidential and embarrassing details of the plaintiff's rape by an unknown assailant in retaliation for the victim's public criticism of the sheriff for failing to diligently investigate the crime constituted adverse action against the plaintiff), *with Mezibov v. Allen*, 411 F.3d 712, 722–23 (6th Cir. 2005) (a prosecutor's statements to the press that a defense attorney was ineffective, looking for a show trial and that the client should ask for his money back did not amount to an adverse action despite the court's assuming for the purposes of its analysis that the statements were defamatory).

Conversely, the Sixth Circuit has held that a threat by a public agency to file suit over a property dispute did not constitute an "adverse action" for purposes of First Amendment retaliation. *Hornbeak-Denton v. Myers*, 361 F. App'x 684, 689 (6th Cir. 2010). The court reiterated in *Hornbeak-Denton* that "[m]ere threats . . . are generally not sufficient to satisfy the adverse action requirement." *Id.* (quoting *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 182 (6th Cir. 2004)). The court recognized that this was not a "hard and fast rule, as there are no doubt stand-alone threats that would deter a person of ordinary firmness from exercising their protected rights." *Id.* Thus, the "adverse action inquiry" is not to be applied "mechanically." *Id.* Rather, "each step of the analysis is flexible enough to take into account the various contexts in which retaliation claims might be made." *Id.* (quoting *Thaddeus–X*, 175 F.3d at 395).

## 2. The Claim Against Varble

The plaintiff asserts that he engaged in activity protected by the First Amendment, pre-election, by criticizing the government and speaking out against the new firehall and new administrative offices during his campaign for alderman and, post-election, by making public records requests, petitioning the government to investigate Varble's conduct, and criticizing "the City's interference in the 2018 election." (Doc. No. 36 ¶ 55.)

Spencer alleges that Varble retaliated against him for engaging in protected activity, first, by "organizing and executing an unlawful campaign effort against Spencer" and, following the election, by "making defamatory and disparaging public statements about Spencer, attempting to intimidate Spencer in public meetings and sending a legally baseless letter from an attorney threatening to sue Spencer." (Doc. No. 36 ¶ 56.) Spencer further claims that a person of ordinary firmness (unlike himself) would have been deterred by these actions from continuing to engage in protected activity.

Varble seeks dismissal of the retaliation claim against him individually on the basis that

(1) the facts as alleged by Spencer do not show that Varble acted under color of state law in campaigning against the plaintiff; (2) even accepted as true, the conclusory allegations in the Amended Complaint do not show that Varble committed acts that would deter a person of ordinary firmness from engaging in protected activity; and (3) the plaintiff does not allege facts showing the Varble himself made defamatory or derogatory statements about the plaintiff or that he had anything to do with the "legally baseless" letter. (Doc. No. 40, at 16–17.)

The court has already determined that the allegations in the Amended Complaint satisfy the first and third elements of the plaintiff's First Amendment retaliation claim: the plaintiff's expression of political views during his campaign for alderman constituted core political activity protected by the First Amendment, and there also seems to be no question, at least at this juncture, that Varble engaged in campaign activity while cloaked with official authority, in response to— because of and in opposition to—the plaintiff's political views. The operative question, for purposes of the individual capacity claim, is whether Varble's responsive actions would "deter a person of ordinary firmness" from engaging in the protected conduct.

Varble's pre-election retaliatory conduct, as discussed above, allegedly consisted of pledging support for the plaintiff's opponent and compelling "up to one hundred" Hendersonville firefighters to campaign against Spencer (Doc. No. 51, at 35), all while using City time and resources. The plaintiff argues that the defendant's assertion that mere "vigorous campaigning" cannot give rise to a retaliation claim "ignores" the "chilling effect" caused by the unlawful use of the authority of the HFD "to coordinate and execute" the campaign against him, using the "purported authority" of "up to one hundred firemen." (Doc. No. 51, at 35.) The court disagrees. If the same individuals had engaged in exactly the same conduct but without identifying as City employees or using City resources, the conduct could only be characterized as political expression

protected by the First Amendment, entirely expected in the context of a contentious political campaign at which competing ideologies were at stake. Even though Varble is alleged to have engaged in this conduct during City time and using City resources, the court cannot find that this behavior would deter a person of ordinary firmness from continuing to campaign on his own behalf and to attempt to spread his own political message. An adverse campaign is the price of running for political office. The fact that Varble may have violated state law or a city ordinance while campaigning against Spencer does not make the conduct so adverse as to give rise to a First Amendment retaliation claim.

The court therefore finds that the Amended Complaint fails to state a First Amendment retaliation claim against Varble based on his purportedly illegal campaign activities. The court pauses, however, to emphasize that this conclusion is limited to the facts presented and, in particular, that Spencer does not allege that Varble misrepresented Spencer's position, impugned him personally, or engaged in conduct that would have been improper if it had been undertaken by a private citizen.

Regarding post-election events, it is not clear whether the plaintiff seeks to base his retaliation claim against Varble on his making defamatory and derogatory comments about him. If he does so intend, any claim on this basis fails simply because Spencer has not actually identified any statements—defamatory or otherwise—that Varble himself made against the plaintiff. The plaintiff attributes those comments to Alderman Cunningham and unidentified others, not to Varble.

Finally, Spencer alleges that "Chief Bush and/or Varble, whether directly or indirectly, requested the attorney for the local firefighters' union to send a letter to Spencer advising that he must stop making records requests and stop making public statements in opposition to the

government or he would be sued." (Doc. No. 36 ¶ 40.) Varble argues that the plaintiff has not alleged facts showing that Varble had anything to do with the letter or shown exactly how it was "legally baseless" or "threatening." (Doc. No. 40, at 17.)

The court finds that, even assuming that the letter was sent at Varble's behest and that it improperly threatened the plaintiff with a lawsuit if he continued to criticize the City government and submit public records requests, the "mere threat" of litigation, in this context, does not constitute an adverse action. *Accord Hornbeak-Denton*, 361 F. App'x at 689 (upholding dismissal of First Amendment retaliation claim, "adher[ing] to the general rule that bare threats [of litigation] are insufficient to constitute adverse actions"). The plaintiff here, although a private citizen, was also a candidate for public office. He was embroiled in political controversy and had repeatedly and publicly charged Varble with inappropriate conduct. Within this context, the court finds that a single letter from the local union threatening litigation would not deter a person of ordinary firmness from continuing to engage in his criticism of Varble and the City government generally.

Accordingly, the First Amendment retaliation claim against Varble individually will be dismissed.

### 3. *The Claim Against the City*

To the extent Spencer seeks to hold the City liable for First Amendment retaliation based on its *post hoc* endorsement or ratification of Varble's pre-election conduct or based on Bush's involvement in compelling the union's attorney to send the threatening letter, the claim fails for the reasons set forth above: these actions were not sufficiently adverse to give rise to a retaliation claim.

Spencer also claims that he suffered adverse actions attributable to the City itself in the form of (1) the posting or reposting of "defamatory and/or derogatory" statements about the plaintiff on social media by Alderman Cunningham and other City officials, with Cunningham

specifically accusing him of "pursuing a 'false narrative'" and asserting that the investigation he had requested was a "waste of taxpayers' money" and (2) Bush's making a public statement that he would not respond further to Spencer's public records requests and implying that he was lying. (Doc. No. 36 ¶¶ 39, 40, 56.)

The court finds that the statements by Cunningham, Bush, and other unidentified City officials were not sufficiently "adverse" to give rise to a retaliation claim, even assuming they could be attributed to the City. *See Alman v. Reed*, 703 F.3d 887, 903 (6th Cir. 2013) ("The plaintiff must 'demonstrate that, through its deliberate conduct, the municipality was the "moving force" behind the injury alleged.'" (quoting *Bd. of Comm'rs v. Brown*, 520 U.S. 397, 404 (1997))). As set forth above, whether defamatory statements can be deemed adverse conduct for purposes of a retaliation claim depends on the context. Here, the plaintiff had run for political office and was engaged in a dispute with the City, asserting that City officials had behaved improperly and had inadequately investigated his claims that they had behaved improperly. It was entirely predictable that City officials would respond to his public allegations by publicly refuting them. This was a matter of public interest. Even if the court accepts at this juncture that the verbal and social media responses, as alleged by the plaintiff, may have given rise to defamation claims under state law, they were not sufficiently adverse to give rise to a First Amendment retaliation claim. And Bush's verbal assertion that he would no longer respond to public records requests was simply a threat. Spencer does not allege that Bush actually had the authority to carry it out or that Spencer was harmed by the City's refusal to respond to any public records requests.

Even considered in the aggregate, the court finds that, given the politically heated context, the allegedly defamatory, derogatory, and threatening statements were not sufficiently adverse to give rise to a viable claim for retaliation in violation of the First Amendment against the City.

### F.    Count III—Equal Protection Claim

#### 1.    Legal Standards

In Count III, the plaintiff articulates a "class of one" equal protection claim under the Fourteenth Amendment. The Supreme Court has recognized "successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam).[10] The first element requires that the plaintiff and the others who were treated differently be "similarly situated in all relevant respects." *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 865 (6th Cir. 2012) (internal quotation marks omitted). The plaintiff has the burden of showing that he is similarly situated to his comparator(s) in all material respects. *Loesel v. City of Frankenmuth*, 692 F.3d 452, 462 (6th Cir. 2012). As for the second element, a "class of one" plaintiff can show that a government action lacks rational basis either by (1) negating "every conceivable basis" that might support the government action; or (2) "demonstrating that the challenged government action was motivated by animus or ill-will." *Johnson*, 946 F.3d at 939 (quoting *Warren v. City of Athens*, 411 F.3d 697, 711 (6th Cir. 2005)).

#### 2.    The Parties' Arguments

The plaintiff claims that the defendants' actions as alleged in the Amended Complaint

---

[10] The Sixth Circuit has continued to entertain "class of one" equal protection claims following the Supreme Court's decision in *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591 (2008), which held that class-of-one equal protection claims are not cognizable in the context of public employment. The Sixth Circuit has noted that it has "on a number of occasions . . . declined to address whether *Engquist* applies outside of that context to other discretionary decisions," *Johnson v. Morales*, 946 F.3d 911, 939 (6th Cir. 2020) (collecting cases), and that "[t]here appear to be good reasons to limit *Engquist*'s applicability outside the public-employment context." *Id.*

constitute a violation of the Equal Protection Clause, because Spencer was "treated differently than any other candidates for office" "intentionally and arbitrarily and without any rational basis." (Doc. No. 36 ¶ 64.) He asserts that the City is liable, because Bush, as chief administrator of the HFD, directed or ratified the unlawful campaign against him, and the mayor, as chief executive officer of the City, directed that Bush investigate the plaintiff's allegations but then failed to discipline Bush or any firemen for illegal actions or to promulgate a policy or custom to prevent improper campaigning in the future. (*Id.* ¶ 65.) In addition, the BOMA, as the governing body of the City, was advised of the details of the allegedly unlawful campaign but effectively ratified it by failing to "take any action to address the unlawful activities and, in fact, prais[ing] it." (*Id.* ¶ 66.)

### 3. *The Claim Against Varble*

In his motion, Varble argues that he is entitled to qualified immunity on this claim, because he "was not on notice that any of his actions might have been violating rights that Plaintiff might have had during his campaign for City Alderman." (Doc. No. 40, at 7.). Substantively, Varble argues that (1) Spencer makes no effort to show that he is similarly situated in all material respects to Jonathan Hayes; and (2) Spencer has not alleged facts showing that Varble acted in his capacity as Fire Marshal or on behalf of the City, rather than as a private individual.

The plaintiff, in response, argues that he was unlawfully treated differently because of his political views. He does not expressly make the argument, but the court presumes him to be arguing that he and Hayes were similarly situated in the sole material respect—they were both running for the position of alderman for Hendersonville's Ward 5—and that treating him and Hayes differently because of their different political views does not satisfy the rational basis test as applied to government action, specifically Varble's actions. He also argues that Varble, by campaigning against him during working hours, using his City-issued phone and office while wearing his Fire Marshal uniform, was a state actor while also campaigning against him.

As previously discussed, the plaintiff adequately alleges that Varble was a state actor when engaged in the challenged activities, and the plaintiff clearly alleges that Varble treated him differently than he treated Hayes based solely on his political views. Regardless, even assuming that the plaintiff's allegations might give rise to a viable class-of-one claim, the court finds that Varble is entitled to qualified immunity. The allegations in support of the equal protection claim are identical to those that support the plaintiff's First Amendment claim. The court has found that no First Amendment violation occurred. Even if Varble's actions—coordinating a campaign against Spencer while on the job and using City facilities—could be deemed to violate either the First or the Fourteenth Amendment, the contours of the plaintiff's right were not "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Baynes v. Cleland*, 799 F.3d 600, 610 (6th Cir. 2015) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). At the granular level, *see Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) (repeating that courts are "not to define clearly established law at a high level of generality"), the issue is whether Varble was on notice that engaging in campaigning activity and enlisting the help of other firefighters, while employing City facilities and without clearly distinguishing between actions taken in his capacity as a union member and private citizen and actions taken in his capacity as Fire Marshal, violated the First Amendment or Fourteenth Amendment rights of another candidate with whose political stance he disagreed. In light of the lack of any case law addressing this particular intersection between a candidate's First (or Fourteenth) Amendment rights and a public employee's First Amendment rights, the court cannot find that the plaintiff's rights in this arena were sufficiently well established to give Varble fair warning of potential liability. Notably, the plaintiff has the burden of showing that an official is not entitled to the defense of qualified immunity. Spencer has not satisfied that burden.

4.      *The Claim Against the City*

Again assuming that the plaintiff's allegations are sufficient to give rise to an equal protection claim based on Varble's actions, the City cannot simply be vicariously liable for Varble's actions. Rather, the plaintiff must establish that Varble's actions can be attributable to a policy or custom of the City itself. *Monell*, 436 U.S. at 690–91.

The plaintiff asserts in response to the City's motion that "the actions of Varble and the firemen were at the direction or acquiescence of Bush, who was the fire chief and the chief administrator of the fire department." (Doc. No. 51, at 24.) He also asserts that, following the election, he brought Bush's, Varble's, and the firemen's actions to the attention of the BOMA and asked the mayor to investigate. The mayor took no action other than to ask Bush to investigate and then to rubber-stamp the results of Bush's purportedly meaningless investigation. (*See id.* at 24–25.) In addition, the mayor and the aldermen were "fully aware of the actions of Varble and the firemen" but praised them rather than condemning the actions or disciplining the actors. Finally, Spencer asserts that the City failed to have in place a policy that would have prevented the firemen from wearing shirts identifying them as HFD firemen while campaigning.

The City argues that the plaintiff cannot establish municipal liability because he has not shown that a City policy or practice was the driving force behind the alleged constitutional violation—specifically, that he does not allege that City officials adopted a policy of permitting City employees to utilize City resources to engage in unlawful political activities or to use City resources for political campaigns, has not alleged the existence of an unofficial custom or policy "so widespread as to have the force of law," or that City resources had ever been used previously to favor a particular candidate in an election. (Doc. No. 42, at 11 (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986)).) Regarding allegations that the mayor or BOMA ratified the allegedly unlawful conduct post-election, the plaintiff admits that the mayor ordered an

investigation into Varble's alleged use of City resources; the Fire Chief subsequently reprimanded Varble for using a City device for personal business; and the plaintiff does not allege that the BOMA itself had any authority to discipline City employees. (*See id.*)

A plaintiff can make a showing of an illegal policy or custom for purposes of establishing municipal liability by demonstrating:

> (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.

*Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)).

The plaintiff here does not allege the existence of an illegal official policy or inadequate training. To the extent he is attempting to establish the existence of a "custom of tolerance or acquiescence of federal rights violations," he has not alleged a pattern of repeated conduct as required to support municipal liability on this basis. *See id.* ("[A] custom-of-tolerance claim requires a showing that there was a pattern of inadequately investigating similar claims."

This leaves only the second option: ratification by an official with final decision making authority. With regard to this type of claim, the plaintiff "would not need to establish a pattern of past misconduct." *Id.* at 479. "However, on a single-act theory, a plaintiff must demonstrate that a 'deliberate choice to follow a course of action is made from among various alternatives by the official . . . responsible for establishing final policy with respect to the subject matter in question." *Id.* (quoting *Pembaur*, 475 U.S. at 483). Importantly, this course of action "must be shown to be the moving force behind or cause of the plaintiff's harm." *Id.* (citing *Pembaur* 475 U.S. at 484–85 (finding *Monell* liability where the final decision maker ordered deputies to enter the plaintiff's medical clinic in violation of his Fourth Amendment right); *Moldowan v. City of Warren*, 578 F.3d

351, 394 & n. 20 (6th Cir. 2009) (affirming the denial of summary judgment on a *Monell* claim where the plaintiff alleged that final policymaker directed the destruction of material evidence)). In other words, "after-the-fact approval of the [course of action], which did not itself cause or continue a harm against [the plaintiff], [is] insufficient to establish [a] *Monell* claim." *Id.* This is because "[s]uch an outcome would effectively make the [City] liable on the basis of *respondeat superior*, which is specifically prohibited by *Monell*." *Id.* (citing *Monell*, 436 U.S. at 694–95).

Thus, that the mayor's investigation was perfunctory and that neither he nor the BOMA effectively disciplined Varble after learning of the allegedly illegal campaigning amounts to post-hoc approval which, under *Burgess*, is not actionable, as such approval after the fact did not cause the alleged harm.

Regarding Bush's actions specifically, the court accepts as true the plaintiff's allegations that, as Fire Chief, Bush was a final decision maker capable of binding the HFD, a division of the City, whose actions could give rise to liability on the part of the City. However, the only allegations in the Amended Complaint suggesting that Bush knew about and condoned any allegedly illegal behavior before it took place are that (1) Bush "shared" Varble's sentiments about Spencer, meaning that he shared Varble's commitment to defeating Spencer's campaign because of Spencer's opposition to the new administrative offices for the HFD and pay raises for firemen (Doc. No. 36 ¶¶ 11, 12); (2) Hayes thanked both Bush and Varble in a text for campaign efforts by firemen, in response to which Bush responded, "Glad its working for you" and "You got this" (*id.*); and (3) Bush "was fully aware of the political campaign being orchestrated by Varble and . . . provided both his support and his direction, whether directly or indirectly." (*Id.* ¶ 22.)

The fact that Bush allegedly "shared" Varble's sentiments about Spencer is not incriminating—Bush's right to his own private political opinion is clearly protected by the First

Amendment. That Hayes thanked Bush for supporting him, and for efforts by firemen to support him, also does not imply that Bush knew or should have known that the firemen were allegedly campaigning while on City time or that Varble was "orchestrating" an improper campaign to benefit Hayes. Finally, Spencer's assertion that Bush was aware of and supported Varble's purported campaign is based on nothing but Spencer's "information and belief." (*See id.*)

As the Supreme Court held in *Bell Atlantic Corp. v. Twombly*, a complaint must be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief can be granted if the complaint does not plead "enough facts to state a claim to relief that is plausible on its face." 550 U.S. 544, 570 (2007) (rejecting the traditional Rule 12(b)(6) standard set forth in *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957)). Under Rule 12(b)(6), "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citations omitted). Even though a complaint need not contain "detailed" factual allegations, its "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (citations omitted).

The plaintiff's claim "upon information and belief" that Bush knew of, directed, or supported Varble's efforts is insufficient under this standard. Reviewing allegations similarly based upon information and belief, the Sixth Circuit has expressly recognized that "[t]he mere fact that someone believes something to be true does not create a plausible inference that it is true." *In re Darvocet Products Liab. Litig.*, 756 F.3d 917, 931 (6th Cir. 2014) (citing *Twombly*, 550 U.S. at 551, as finding a complaint insufficient even though it said, "Plaintiffs allege upon information and belief that [defendants] have entered into a contract, combination or conspiracy to prevent competitive entry," and *16630 Southfield Ltd. P'ship v. Flagstar Bank*, 727 F.3d 502, 506 (6th Cir.

2013), as finding a series of "upon information and belief" claims to be insufficient, because the plaintiffs "have merely alleged their 'belief'").

The plaintiff here makes no attempt to substantiate the assertions regarding Bush's support with reference to actual facts, as opposed to rank speculation. This is precisely the type of pleading the Sixth Circuit has found to be insufficient. *See 16630 Southfield Ltd.*, 727 F.3d at 506 ("These are precisely the kinds of conclusory allegations that *Iqbal* and *Twombly* condemned and thus told us to ignore when evaluating a complaint's sufficiency. No doubt disparate treatment of similarly situated people may support an inference of discrimination. But the plaintiffs . . . have merely alleged their 'belief' that such people exist. These naked assertions devoid of further factual enhancement contribute nothing to the sufficiency of the complaint." (internal quotation marks and citations omitted)).

The claim against the City is subject to dismissal because the plaintiff has not alleged facts that, if true, would give rise to municipal liability under *Monell*.

## IV.     CONCLUSION

For the reasons forth herein, the court will grant both Motions to Dismiss and dismiss this action in its entirety. The court does not reach the defendants' arguments seeking dismissal of Count V, for punitive damages, as any claim for damages is rendered moot by a finding that the defendants are not liable for the alleged conduct, so the claim for punitive damages will be dismissed on that basis.

An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge